# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In the Matter of the Complaint of Crazy Pants LLC and the Estate of Gregory John Daiker for Exoneration from or Limitation of Liability | Case No. 2:23-cv-00023-BLW *Consolidated for discovery with: 2:24-cv-00305-BLW and 2:24-cv-00307-BLW* |

DEBORAH ANN BROWN, as
Administrator of the Estate of
GREGORY JOHN DAIKER, and
CRAZY PANTS, LLC,

      Third-Party Plaintiffs,

      v.

SCOTT KOTTMANN and JANE DOE
KOTTMANN, CLIENT MARINE
SERVICES, LLC, a Missouri limited
liability company, GREG KOTTMANN
and JANE DOE KOTTMANN, DEVIN
WOZENCRAFT and JANE DOE
WOZENCRAFT, WOZENCRAFT
INSURANCE AGENCY, INC., a
California corporation dba
WOZENCRAFT INSURANCE AND
FINANCE, RANDY SCISM and JANE
DOE SCISM, MARINE
TECHNOLOGY, INC., a Missouri
corporation, MERCURY MARINE, a
division of Brunswick Corporation, a
Delaware corporation; PERFORMANCE
LLC, a Missouri limited liability
company dba PERFORMANCE BOAT
CENTER and JOHN DOES 1 – 10,

      Third-Party Defendants.

**MEMORANDUM DECISION AND ORDER**

# INTRODUCTION

Before the Court are two motions: (1) Third-Party Defendant[1] Performance LLC's Consolidated Motion to Dismiss (Dkt. 114); and (2) Third-Party Defendants Marine Technology Inc. (MTI) and Randy Scism's Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Dkt. 115). Third-Party Defendants Devin Wozencraft and Wozencraft Insurance Agency (the "Wozencraft Defendants"), as well as Third-Party Defendant Mercury Marine, join the motions to the extent they argue the Court lacks admiralty subject-matter jurisdiction. *See* Dkts. 117, 121.

The Court heard argument on October 27, 2025 and is now prepared to issue its decision. For the reasons explained below, the Court lacks personal jurisdiction over Performance LLC and will therefore dismiss it from all complaints filed in this consolidated matter. The Court will also grant the motions to dismiss Limitation Plaintiff/Third-Party Plaintiff Crazy Pants' limitation-of-liability complaint for lack of admiralty jurisdiction. The Court will not, however, dismiss Crazy Pants' amended third-party complaint.

---

[1] Throughout this opinion, for ease of reference and simplicity, the Court will typically refer to the various parties in accordance with their procedural stance in the limitation-of-liability action. Thus, Performance LLC is referred to only as a Third-Party Defendant, rather than as a "Defendant and a Third-Party Defendant." Additionally, throughout the opinion the Court will sometimes collectively refer to three litigants—Crazy Pants, LLC, the Estate of Gregory John Daiker, and Deborah Brown (the administrator of the Daiker Estate)—as "Crazy Pants."

# BACKGROUND

This case arises from a June 28, 2022 boating accident that claimed the lives of all four men aboard—Gregory Daiker, Aaron Faulhaber, Jason Maxson and John Schulte. At the time of the accident, Daiker was allegedly operating the boat at over 100 miles per hour while intoxicated. *See Faulhaber Claim* ¶ G, Dkt. 13; *Schulte Claim* ¶ F, Dkt. 18.

## A. Manufacture and Delivery of the *King of the May*

The boat involved in the accident was the *King of the May*, a high-performance speedboat manufactured by MTI, of Wentzville, Missouri. In 2018, Daiker, a resident of Laclede, Idaho, purchased the *King of the May* directly from MTI. Afterward, he set up a Montana limited liability company—Crazy Pants, LLC—for the purposes of owning the boat and registering it in Montana. *See Brown Dec.* ¶ 26, Dkt. 75. He also established Montana RV Registration, LLC, another Montana-based entity, as Crazy Pants' sole manager. *Krisher Dec.*, Ex. 1 thereto, at 2, Dkt. 114-2. As part of the purchase price, MTI delivered the boat to Idaho. *See Brown Dec.* ¶ 7, Ex. 3. The delivery took place in LaClede, Idaho in July 2019. Before delivery, Daiker traveled to Missouri for an inspection and test drive. Based on text messages between Daiker and an MTI employee, it appears that Daiker inspected the boat at Performance LLC's marina in Osage Beach, Missouri, which is near MTI's facility. *See* Dkt. 124, at 4; *see also July 2019 Text*

*Messages, Ex. 1 to Nicoll Dec.,* Dkt. 127.[2]

## B. Performance's Work on the Boat

After taking delivery of the *King of the May,* Crazy Pants had issues with the engines overheating and with regulating the boat's trim. *Brown Dec.* ¶ 28, Dkt. 75. Eventually, a decision was made to send the boat back to Missouri for "warranty work." *Id.* An MTI representative met Daiker at Lake Havasu and towed the boat to Missouri. *Id.*

In May 2021, after the boat arrived in Missouri, Performance worked on the boat at its Osage Beach, Missouri facility. Performance is a Missouri limited liability company with its principal place of business in Osage Beach. Its business includes servicing pleasure craft, including high-performance boats like the *King of the May*. Performance has no facilities or employees in Idaho and performed work on the *King of the May* after MTI referred the work to it.

Performance says it helped Crazy Pants solve the overheating issue by fixing a faulty water line in the engine and that this work "came to Performance based on a request from MTI for Performance to inspect and service the boat." *Waddington*

---

[2] Based on this evidence, Crazy Pants, as well as the Faulhaber and Schulte claimants, argue that "the clear suggestion is that Performance had some involvement in the construction, finish work, and/or testing of the boat in June 2019, before its completion . . . ." *Crazy Pants Response,* Dkt. 126, at 6; *see also Schulte Response,* Dkt. 124, at 4; *Faulhaber Response,* Dkt. 125, at 5. This issue will be discussed further below, in connection with the Court's discussion of whether jurisdictional discovery is warranted.

*Supp. Dec.* ¶ 2, Dkt. 136. Still, though, Crazy Pants points out that Performance didn't simply perform warranty work on the boat for MTI; rather Performance engaged directly with Daiker to perform other work on the boat, including installation of a trim-sync device. *See Response,* Dkt. 126, at 7 (citing *Nicoll Dec.* ¶ 3, *Ex. 2 thereto at "Daiker 000616-619",* Dkt. 127-2); *see also Nicoll Dec.* ¶ 1, *Ex. 1 thereto at "Performance 000008-000014,"* Dkt. 127-1. Performance agrees that it installed a "Trim-Sync," but says this device does not alter the boat's trim. *See Waddington Dec.* ¶¶ 13, 15 n.1, Dkt. 114-4. More broadly, Performance's co-owner explains that its "servicing of the *King of the May* was a 'one-time-thing,' pursuant to MTI's request." *Waddington Supp. Dec.* ¶¶ 23-24, Dkt. 136.

Performance completed its work on the *King of the May* in the summer of 2021 and did not touch the boat after it left its Osage Beach facility. *Id.* ¶ 22. Once the work was completed, MTI towed the boat to Montana, and Daiker towed it the rest of the way to Idaho. *See Brown Dec.* ¶ 28, Dkt. 75.

## C. The Location of the Accident

The fatal accident occurred roughly a year later, on June 28, 2022, on the Pend Oreille River near Old Thama Ferry Road, in Bonner County, Idaho. A key issue for purposes of the pending motions is whether the accident occurred on navigable waters of the United States. The parties dispute whether this is so, and the dispute ultimately centers on whether an old log chute at the Albeni Falls Dam

renders the Pend Oreille River "navigable." Relevant facts regarding the Pend

Oreille River system and the Albeni Falls Dam are as follows:

- The Pend Oreille River connects to Lake Pend Oreille. The waters flowing from Montana toward Lake Pend Oreille are dammed on the eastern side of Idaho by the Cabinet Gorge Dam. And the waters flowing westward from Lake Pend Oreille to Washinton are dammed by the Albeni Falls Dam.

- It is not possible to travel by vessel from Idaho into Washington using the waters of the Pend Oreille River system because of the Albeni Falls Dam.

- The Albeni Falls Dam was built in the early 1950s and remains in place today. The dam was originally constructed with a log chute, which allowed passage of timber from Idaho westward into Washington.

- The aerial photos shown below depict the dam around 1950 and more recently, though the exact dates are not known.





- During the period when the log chute was in use in the 1950s, workers known as "boommen" guided logs through the chute for downstream transport.

- Not long after the dam was completed, companies that had used the log chute transitioned away from using the chute, opting instead for different modes of transportation to move logs from Idaho into Washington.

- The log chute has not been used to transport logs into Washington for nearly 70 years; the last known use for this purpose was in 1958. Since that time, the log chute has fallen into disuse and disrepair.

- The chute did reopen in 2005—but only in connection with a 50th anniversary celebration for the purpose of floating rubber duckies through the chute.

- The log chute is currently inoperable. Although it has a Tainter gate—which lifts to allow movement of logs downstream—that gate has been decommissioned and has not been serviced since 2005.

- The Dam's Operating Project Manager, Amanda Smith, indicates that although there are no current plans to demolish the log chute, it has fallen

into disrepair and could not be operational absent significant rehabilitative efforts. In her words, "Inspection, design, analysis and rehabilitative construction of the log chute would be required prior to the log chute returning to service. Such an undertaking would be significant, expensive, and require congressional appropriation." *Smith Dec.* ¶ 10, Dkt. 135.

- Inspections of the log chute in 2022 and 2023 revealed that portions of the chute were undermined, with eight feet of the chute's floor slab unsupported. *Id.* ¶ 9.

- Since 2021, a boom barrier has blocked access to the chute. The boom barrier consists of a series of connected buoys designed to create a floating obstacle across the Pend Oreille River that prevents vessels and other objects, including logs, from approaching the dam's spillway. *Id.* ¶ 8.

## D. The Lawsuits

### 1. The State-Court Wrongful Death Action

Multiple lawsuits were filed after the June 2022 accident. In December 2022, Jenny Faulhaber, widow of passenger Aaron Faulhaber, filed a wrongful-death suit in the Idaho state court, Bonner County Case CV09-22-1707. Faulhaber named Crazy Pants, LLC and the Estate of Gregory Daiker as defendants.

### 2. The Limitation Action

A few weeks later, on January 13, 2023, Crazy Pants commenced this federal action by filing a Complaint for Exoneration From or Limitation of Liability under 46 U.S.C. § 30501 et seq. and Supplemental Rule F, invoking this Court's admiralty jurisdiction under 28 U.S.C. § 1333. The Court subsequently granted its motion to stay all claims and proceedings against the plaintiffs. *See Jan. 26, 2023 Order,* Dkt. 7. Following that order, Jenny Faulhaber, the Faulhaber

Estate, Alexandra Schulte, and the Schulte Revocable Living Trust filed proofs of claim in this action. *See* Dkts. 13, 14, 17, 18. Each claimant seeks several million dollars in damages.[3]

### 3. The Third-Party Complaint

In the summer of 2024—over a year after they had filed their Limitation-of-Liability Complaint—Crazy Pants and Deborah Brown (as administrator of the Daiker Estate) filed a third-party complaint against various parties, including MTI, Performance, Mercury Marine, the Wozencraft Defendants, and others. *See* Dkt. 54. Crazy Pants alleges product liability, negligence, and gross negligence as to Mercury Marine and MTI, and negligence as to MTI and Performance. And it alleges a claim for "Third Party Spoliation" against MTI, Scism, the Wozencraft Defendants, Scott Kottmann, Greg Kottmann, and Client Marine Services, LLC.

The product liability and negligence claims arise from allegations that the boat was defectively designed, manufactured, or repaired. The spoliation claims arise from what happened to the boat in the months after the accident. *See*

---

[3] *See Alexandra Schulte Claim,* Dkt. 17 (seeking $1.5 million in economic losses; $3.5 million in noneconomic damages; and $5 million in punitive damages); *John Schulte Revocable Living Trust Claim,* Dkt. 18 (seeking $3 million in economic losses; $3.5 million in non-economic losses; and $5 million in punitive damages); *Jenny Faulhaber Claim,* Dkt. 13 (seeking $1.756 million in economic losses; $3 million in noneconomic losses; and $5 million in punitive damage); *Faulhaber Estate Claim,* Dkt. 14 (seeking $1.756 in economic losses and $5 million in punitive damages).

*generally Brown Dec.,* Dkt. 75. Briefly, Crazy Pants alleges that Third-Party

Defendants Scott Kottmann, Greg Kottmann, Devin Wozencraft, Wozencraft

Insurance Agency, Randy Scism, Client Marine Services, and/or MTI

"individually or in concert with one another"—and with knowledge of the probable

or pending lawsuit—substantially altered or destroyed the boat. *Am. Third-Party*

*Comp.* ¶ 7.2, Dkt. 54. The upshot is that the boat is no longer available for

inspection.

### 4. Faulhaber's and Schulte's Federal Complaints

A few months after Crazy Pants filed the third-party complaint, the

Faulhaber and Schulte claimants filed separate complaints in this Court against the

same third-party defendants named in Crazy Pants' amended third-party complaint.

*See Faulhaber v. Kottmann,* No. 2:24-cv-305-BLW; *Schulte v. Kottmann*, 2:24-cv-

307-BLW. These complaints—which have been consolidated with the above-

captioned limitation action for discovery purposes—allege similar claims: (1)

product liability and/or negligence claims as to MTI, Mercury Marine, and

Performance; and (2) spoliation claims as to Kottmanns, Client Marine Services,

the Wozencraft Defendants, and MTI and Scism.

## E. The Pending Motions

Performance now moves to dismiss, asserting that the Pend Oreille River is

not a navigable water for purposes of admiralty jurisdiction and, further, that the

Court lacks personal jurisdiction over it in any event. MTI and Scism, joined by the Wozencraft Defendants and Mercury Marine, filed a parallel motion challenging admiralty jurisdiction. (These defendants do not contend that this Court lacks personal jurisdiction over them.)

## DISCUSSION

## A. Performance's Motion to Dismiss for Lack of Personal Jurisdiction

The Court will first address Performance's motion to dismiss for lack of personal jurisdiction and then turn to the motions to dismiss for lack of subject-matter jurisdiction. *See generally Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 588 (1999) (district courts may resolve straightforward personal jurisdiction issues before resolving complex subject-matter jurisdictional challenges).

### 1. Waiver

As a threshold matter, Crazy Pants, as well as the Faulhaber and Schulte claimants, argue that Performance waived its right to assert a personal-jurisdiction defense. To support this argument, they rely on the fact that Performance filed an *Answer to Amended Third-Party Complaint and Counterclaim and Crossclaim. See* Dkt. 57. But in this pleading—within the Answer section—Performance explicitly stated that "[t]his Honorable Court lacks personal jurisdiction over Performance." *Id.* ¶¶ 2.2, 3. Elsewhere in this same pleading, in a section denoted as a Counterclaim, Performance included this sentence: "The Court has personal

jurisdiction *over the counterclaim defendants* [i.e., Crazy Pants and the Daiker Estate] by virtue of their consent to same by bringing the present action in this Honorable Court." *Id.* ¶ 4, at 13.

Performance did not waive its personal-jurisdiction defense. Under Federal Rule of Civil Procedure 12(h)(1), a party waives a personal-jurisdiction defense only by (1) failing to include it in the party's first Rule 12 motion, or (2) failing to raise it in the party's first responsive pleading if no Rule 12 motion is made. A defendant preserves the defense by asserting it in its initial responsive filing—even if it later files motions, participates in discovery, or pleads counterclaims or cross-claims. *See Argonaut Ins. Co. v. St. Francis Med. Ctr.*, 17 F.4th 1276, 1281 (9th Cir. 2021); *Hillis v. Heineman,* 626 F.3d 1014, 1018–19 (9th Cir. 2010); *SEC v. Ross,* 504 F.3d 1130, 1149 (9th Cir. 2007).

Here, in answering the third-party complaint, Performance expressly asserted lack of personal jurisdiction as an affirmative defense.[4] As such, Performance preserved the defense under Rule 12(h)(1)(B)(ii). The later Rule 12(b)(2) motion simply seeks adjudication of a defense already pled.

Performance's assertion of counterclaims and participation in pretrial

---

[4] Performance likewise asserted lack of personal jurisdiction as a defense in answering the separately filed complaints in *Faulhaber v. Kottmann*, No. 2:24-cv-00305-BLW*,* and *Schulte v. Kottmann,* No. 2:24-cv-00307-BLW.

coordination do not constitute waiver. The Ninth Circuit has held that "a party's assertion of a counterclaim does not waive a previously made jurisdictional objection," *Ross*, 504 F.3d at 1149, and that filing counter- or cross-claims consistent with Rule 13 is compatible with preserving threshold defenses. *See Argonaut*, 17 F.4th at 1281 ("Because the Rules allow threshold defenses such as lack of personal jurisdiction to be pled by answer, those defenses are preserved even if coupled with counterclaims."). Similarly, ordinary participation in discovery or case-management proceedings, especially when compelled by court order, does not amount to consent to jurisdiction. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318–19 (9th Cir. 1998).

Accordingly, the Court concludes that Performance did not waive its personal-jurisdiction defense and will proceed to the merits of that defense.

### 2. The Governing Legal Standard

When a defendant moves to dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the exercise of personal jurisdiction is appropriate. *See, e.g., Herbal Brands, Inc. v. Photoplaza, Inc.,* 72 F.4th 1085, 1090 (9th Cir. 2023). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman,* 571 U.S. 117, 125 (2014). But because Idaho's long-arm statute—Idaho Code § 5-514—would permit broader

jurisdiction than that authorized under the Due Process Clause of the Fourteenth Amendment, the Court need only look to the Due Process Clause to determine personal jurisdiction. *Wells Cargo, Inc. v. Transport Ins. Co.,* 676 F. Supp. 2d 1114, 1119 (D. Idaho 2009). "Thus, under Idaho law, the jurisdictional analysis and the federal due process analysis are the same." *Id.*

Where a defendant's motion to dismiss is based on written materials, and "in the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts" to avoid dismissal. *Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir. 1990). And the Court must take the plaintiff's uncontroverted allegations as true and resolve factual disputes in affidavits in plaintiff's favor. If, however, the defendants offer evidence supporting their motion to dismiss, the plaintiff may not simply rest on the bare allegations of its complaint. Rather, the plaintiff must then "come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." *Amba Marketing Systems, Inc. v. Jobar Int'l, Inc.* 551 F.2d 784, 787 (9th Cir. 1977) (citations omitted).

The exercise of personal jurisdiction over a defendant comports with due process if the defendant "has 'certain minimum contacts' with the relevant forum such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (*quoting Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945)). Sufficient minimum contacts can result in general or specific jurisdiction. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801-02 (9th Cir. 2004). Here, Crazy Pants concedes that Performance is not subject to general personal jurisdiction, so the Court considers specific jurisdiction only. *See Response,* Dkt. 126, at 16. Broadly speaking, specific jurisdiction grows out of "'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984)).

The Ninth Circuit uses a three-prong test to determine whether a defendant has sufficient minimum contacts for the exercise of specific personal jurisdiction:

(1)  The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2)  the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)  the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two prongs of this test. *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id*. "On the other hand, if the plaintiff succeeds in satisfying both of the first two prongs, the

burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007) (cleaned up). "All three prongs must be met to exercise personal jurisdiction over the defendant." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023). Finally, although the purposeful-direction test is typically used for tort cases and purposeful-availment is typically used in contract cases, the Ninth Circuit has held that personal jurisdiction can be found by either purposeful direction, purposeful availment, or "'some combination thereof.'" *Id.* (citation omitted).

Here, the parties dispute whether the Court should apply the purposeful-direction or the purposeful-availment framework, but it doesn't ultimately matter because neither test is satisfied. Performance has not purposefully directed is activities toward Idaho, nor has it purposefully availed itself of the privilege of conducting business in Idaho.

### 3. Purposeful Availment

The Court will begin with purposeful availment. As noted above, the purposeful-availment framework typically applies to contract claims, and Performance has not been sued for breach of contract. Rather, it faces negligence and product-liability claims in the complaints on file in this consolidated action. (Specifically, Crazy Pants and Daiker assert a negligence claim; Faulhaber asserts

negligence and gross negligence claims; and Schulte asserts negligence, gross negligence, and product-liability claims.) Still, the Court will conduct a purposeful-availment analysis because Performance contracted directly with Daiker to perform work on the *King of the May.*

Purposeful availment requires that the defendant deliberately create continuing obligations with forum residents or otherwise invoke the benefits and protections of the forum's laws. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76 (1985). The analysis focuses on whether the defendant's contacts are the result of its own affirmative conduct, not the unilateral actions of the plaintiff. *Id.; Walden v. Fiore,* 571 U.S. 277, 284–85 (2014). A "one-shot" or isolated transaction, particularly where the defendant performs all of its obligations outside the forum, generally does not constitute purposeful availment. *Boschetto v. Hansing,* 539 F.3d 1011, 1017–18 (9th Cir. 2008); *see also Burger King,* 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.")

Measured against these standards, Performance did not purposefully avail itself of the privilege of conducting business in Idaho. The undisputed evidence shows that Performance is a Missouri limited liability company with its principal place of business in Missouri; it has no offices, employees, property, or business

operations in Idaho; and all work performed on the *King of the May* occurred in Missouri. Performance did not sell the vessel, did not deliver it to Idaho, and did not advertise or market its services in Idaho. The record also establishes that although Daiker likely visited Performance's Osage Beach marina in 2019, Performance had no involvement with Daiker or the boat until 2021. In sum, nothing in the record shows that Performance sought to further its business in Idaho. Rather, its involvement in this case is limited to the fact that it accepted a referral from MTI to service the boat in connection with an MTI warranty.

Likewise, the fact that Performance communicated directly with Daiker and performed work beyond the MTI-directed warranty service does not establish purposeful availment. Any such work was performed in Missouri and arose from a discrete service engagement, not from an ongoing contractual relationship deliberately anchored in Idaho. Crazy Pants' reliance on Daiker's Idaho residency and the fact that the vessel would later be operated in Idaho is unavailing; "[t]he plaintiff cannot be the only link between the defendant and the forum." *Walden,* 571 U.S. at 285.

On this record, the Court concludes that Performance did not purposefully avail itself of the privilege of conducting activities in Idaho.

### 4.    Purposeful Direction

Crazy Pants also contends that Performance purposefully directed its

conduct toward Idaho. As noted, this framework typically applies in intentional tort cases, and it asks whether the defendant committed an intentional act that was expressly aimed at the forum and caused harm that the defendant knew was likely to be suffered there. *Schwarzenegger,* 374 F.3d at 803. Here, the third-party plaintiffs do not allege that Performance committed *intentional* torts. (The same is true with respect to the Faulhaber and Schulte claimants.) Rather, the claims against Performance sound in negligence, gross negligence, and products liability. Accordingly, the *Calder* "effects test"—based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984)—does not govern the jurisdictional analysis. *See Herbal Brands*, 72 F.4th at 1090. Instead, the relevant inquiry is as described in the preceding section—which essentially asks whether Performance deliberately engaged in forum-directed conduct. *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.,* 485 F.3d 450, 460 (9th Cir. 2007). For the reasons already explained, plaintiffs have not satisfied this standard.

Moreover, this conclusion would not change if the Court applied the *Calder* effects test. Performance did not expressly aim any conduct at Idaho, and the mere fact that injury ultimately occurred in Idaho is insufficient to establish personal jurisdiction. *See generally Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.")

Because the first prong of the three-prong test articulated above has not been satisfied, the Court need not reach the second or third prongs. Rather, for the reasons just explained, the Court lacks personal jurisdiction over Performance.

### 5.    Jurisdictional Discovery

Crazy Pants, joined by the Faulhabers and Schultes, request limited jurisdictional discovery if the Court finds the existing record insufficient to resolve personal jurisdiction. The Court will deny the requests.

Jurisdictional discovery is appropriate where "jurisdictional facts are contested or more faces are needed." *Laub v. U.S. Dep't of Interior,* 342 F.3d 1080, 1093 (9th Cir. 2003). But a request for discovery based on speculation or the mere hope that additional facts might surface is insufficient. *Butcher's Union Local No. 498 v. SDC Investment, Inc.,* 788 F.2d 535, 540-41 (9th Cir. 1986).

Here, the jurisdictional deficiency is legal rather than factual. Even accepting some of the key facts on which Crazy Pants relies—mainly, that Mr. Daiker engaged directly with Performance during 2021, regarding the warranty and non-warranty work; and that Performance knew the vessel would ultimately be operated in Idaho—those facts, even considered alongside the other facts outlined above, would not add up to purposeful availment or purposeful direction.

And as far as Crazy Pants' speculation that Performance was involved with the *King of the May* in 2019, the parties have already conducted some discovery on

this issue, and Performance has submitted a declaration flatly denying any such involvement. Performance's co-owner, Mark Waddington, has attested to the following: "Neither I nor my employees knew MTI, Mr. Griffith, Daiker, Crazy Pants, LLC or anyone else tested the *King of the May* in 2019. Neither I nor my employees were involved with testing the vessel at that time. Neither I nor my employees were involved with any work on the *King of the May* in 2019." *Waddington Supp. Dec.* ¶ 15, Dkt. 135. Mr. Waddington further explains that Performance has already produced records regarding Daiker, Crazy Pants, and the *King of the May*, and that it has no documents referencing these parties or the boat prior to May 2021. *Id.* ¶ 4; *see also Performance Reply*, Dkt. 134 (explaining that Performance produced expedited discovery responses to Crazy Pants, including interrogatory responses.) Under these circumstances, Crazy Pants' request for further discovery regarding Performance's involvement with the boat before May 2021 is based on speculation or hope that additional facts might surface. The Court will not exercise its discretion to allow such discovery.

### 6.  Dismissal of Performance from All Complaints

For all these reasons, the Court will not permit any additional discovery and will dismiss Performance, LLC as a defendant from all complaints pending in this consolidated action. The Court recognizes that this case has been consolidated with two related actions filed by the Faulhabers and Schultes for discovery purposes

only. Consolidation under Rule 42(a) does not merge the actions into a single case or alter their distinct jurisdictional foundations. *See Hall v. Hall*, 584 U.S. 59, 71 (2018). Here, though, Performance moved to dismiss itself "from this lawsuit." *See Motion,* Dkt. 114. It did not explicitly state that it was seeking dismissal from all three complaints on file in this consolidated action, though it did so implicitly when it identified itself as a "defendant," "third-party defendant" and "claim-defendant" and "party to this consolidated lawsuit." *Mtn. Mem.,* Dkt. 114-1, at 1. Further, the Faulhaber and Schulte plaintiffs separately responded to the motion to dismiss so the issues related to personal jurisdiction have been fully ventilated from all plaintiffs' and claimants' perspectives. Plus, as a matter of law and logic, the Court's conclusion that it lacks personal jurisdiction over Performance as to Crazy Pants applies equally to the claims asserted by the Faulhaber and Schulte plaintiffs. Accordingly, the Court will dismiss Performance as a defendant in all complaints on file in this consolidated action.

If Performance were the only defendant, the Court would transfer this matter to the Western District of Missouri. But no plaintiff requested a transfer, and this is a complex, multi-defendant case. Accordingly, the Court will simply dismiss all claims against Performance without prejudice.

## B. The Motions to Dismiss the Limitation-of-Liability Complaint for Lack of Subject-Matter Jurisdiction

The Court must next decide whether it has subject-matter jurisdiction over

the limitation-of-liability complaint, as the moving parties have challenged Crazy Pants' invocation of admiralty jurisdiction.

A federal court's authority to hear admiralty cases is set out in Article III, § 2 of the Constitution, which states that federal judicial power extends "to all Cases of admiralty and maritime Jurisdiction; . . . ." U.S. Const. art. III, § 2. Consistent with that constitutional grant of power, Congress enacted 28 U.S.C. § 1333(1), which provides that district courts have original, exclusive jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction."

### 1.  Governing Legal Standard

A jurisdictional attack on subject-matter jurisdiction may be facial or factual. *See White v. Lee*, 277 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004). In contrast, a factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*.

Because the moving defendants rely on extrinsic evidence, their attack on the Court's subject-matter jurisdiction is a factual one. To resolve a factual attack on jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" so long as resolving the factual issues relating to the issue of jurisdiction do not go to

the merits of the action. *Id.* In resolving a factual attack, the Court need not

presume the truth of the complaint's jurisdictional allegations. *Id.*

### 2. The Location Requirement

Crazy Pants bears the burden of establishing admiralty jurisdiction, which

requires it to satisfy the two-part test articulated in *Jerome B. Grubart, Inc. v.*

*Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995): *First,* the tort must

have occurred on "navigable waters" (the location requirement), and *second,* the

incident must bear a substantial relationship to traditional maritime activity (the

connection requirement). *See Taghadomi v. United States*, 401 F.3d 1080, 1084

(9th Cir. 2005).

Determining whether the location requirement is satisfied turns on whether

the subject waterway is "navigable in fact." *See The Daniel Ball,* 77 U.S. 557, 563

(1870). Over 150 years ago, the Supreme Court explained that waterways are

"navigable in fact" "when they form in their ordinary condition by themselves, or

by uniting with other waters, a continued highway over which commerce is or may

be carried on with other States or foreign countries in the customary modes in

which such commerce is conducted by water." *Id.; see also Garrett,* 981 F.3d 739,

741 (9th Cir. 2020); *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir.

1975) ("A waterway is navigable provided that it is used or susceptible of being

used as an artery of commerce.").

The Ninth Circuit has since clarified that for a waterway to be "navigable in fact," it must have the present capability for interstate commercial navigation. In *Adams v. Montana Power Co.,* 528 F.2d 437 (9th Cir. 1975), the court held that a 25-mile stretch of the Missouri River impounded between two dams was not navigable for admiralty purposes. The court explained that "if the damming of a water-way has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over events transpiring on that body of water, *whether or not it was originally navigable.*" *Id.* at 440 (emphasis added). In other words, admiralty jurisdiction is not immutable. Physical changes to a waterway—such as the construction of dams or other permanent obstructions—may eliminate its capacity to function as an interstate commercial artery, and with it, the federal interest in applying maritime law.

The Ninth Circuit reaffirmed this principle in *Garrett*, 981 F.3d 739 (9th Cir. 2020), where it rejected admiralty jurisdiction over a boating accident on Holter Lake—a Montana reservoir enclosed by dams—because the dams "preclud[ed] it from serving as an artery of interstate commerce." *Id.* at 741. Other circuits follow the same principle. *See, e.g., Tundidor v. Miami–Dade County,* 831 F.3d 1328, 1332–34 (11th Cir. 2016); *LeBlanc v. Cleveland*, 198 F.3d 353, 359–60 (2d Cir. 1999); *Livingston v. United States,* 627 F.2d 165, 169–70 (8th Cir. 1980).

Here, the Court easily concludes that the Pend Oreille River system is not

navigable in fact. The Pend Oreille River system is indisputably incapable of accommodating interstate vessel traffic. And it is likewise incapable of accommodating interstate log floating. (For purposes of this decision, the Court assumes, without deciding, that log floating may qualify as a customary mode of interstate commerce.) Said differently, the Court concludes that the Pend Oreille River system is not presently being used as an artery of interstate commerce and is not presently susceptible of being used as an artery of interstate commerce.

Crazy Pants concedes that the log chute at the Albeni Falls Dam has not been used for interstate commercial log passage since 1958 and that it has since fallen into a state of disuse and disrepair. As Crazy Pants itself says, "[i]n the absence of needed rehabilitation and/or repair, the log chute could not currently be used to float logs from Idaho into Washington. Nor could it have been used on the day of the accident." *See Response,* Dkt. 126, at 10.

The record evidence confirms this. This evidence was detailed above, but portions of it bear repeating here. Amanda Smith, the Operating Project Manager at the Albeni Falls Dam, has submitted a declaration explaining that the log chute was used only between 1955 and 1958 (and then again briefly in 2005 for a ceremonial rubber-duck event). She explains that the log chute's Tainter gate—a gate which lifts to allow passage of timber downstream—"has been decommissioned since 2005 and has not been serviced since 2005." *Smith Dec.* ¶ 7.

Additionally, "a boom barrier blocks access to the log chute and has been in place since 2021." *Id.* ¶ 8. Periodic inspections of the log chute (in 2022 and 2023) "revealed that portions of the log chute were undermined, with eight feet of the log chute's floor slab unsupported." *Id.* ¶ 9. All to say that the log chute is not currently being used or susceptible of being used as an artery of interstate commerce. As Ms. Smith notes, restoration of the log chute would require "[i]nspection, design analysis and rehabilitative construction" and such an undertaking would be "significant, expensive, and require congressional appropriation." *Id.* ¶ 9.

Despite this evidence, Crazy Pants says that the river system is navigable because the log chute could, "with reasonable improvements," be returned to operational status. *Response,* Dkt. 126, at 4. But that is not the right question. The relevant inquiry focuses on *present* physical conditions and capabilities, not historical conditions or hypothetical future conditions, after restoration. A waterway is not "navigable in fact" merely because it once supported interstate commerce or because it could be rendered capable of doing so again through repair, rehabilitation, or discretionary governmental action.

Crazy Pants' invocation of navigability concepts drawn from other contexts—such as cases involving the Commerce Clause—does not alter the Court's conclusion. *Id.* at 30 (citing *Davis v. United States*, 185 F.2d 938 (9th Cir.

1950)); *id.* at 31 (citing *Swanson v. United States*, 600 F. Supp. 802, 804-805 (D. Idaho 1985), *aff'd* 789 F. 2d 1367 (9th Cir. 1986)). As the Ninth Circuit has explained, definitions of navigability may vary depending on the context. *Adams*, 528 F.2d at 440. Thus, even if a waterway may be treated as "navigable" in a case involving the Commerce Clause, that does not answer whether it is navigable for determining admiralty tort jurisdiction.

Crazy Pants' reliance on the Second Circuit's decision in *Lockheed Martin Corp. v. Morganti,* 412 F.3d 407 (2d Cir. 2005) is likewise unavailing. The *Morganti* Court rejected Lockheed Martin's convoluted navigability argument, which proceeded along the following lines: The topography of the lake at issue and the economic conditions of the surrounding areas rendered commercial shipping unprofitable, which meant the lake was not susceptible of being used for commercial shipping, which meant the lake was not navigable. *Id.* at 412. The *Morganti* Court rightly noted that "[t]he question of whether it would be economically difficult to profitably use Cayuga Lake commercially is a fundamentally different question that does not affect whether the lake is capable of being used for commerce." *Id.* at 413.

Nothing in *Morganti* suggests that the Court should disregard the current physical condition of a waterway in deciding navigability in an admiralty case. *See id.* (holding that "where the waterway is not physically obstructed but only

economically inactive, the federal interest remains"). Here, as noted above, the undisputed evidence establishes that the log chute at the Albeni Falls Dam has not been used for decades, is in a state of disrepair, and could not be placed into service absent substantial inspection, design, and rehabilitative construction. That is not the sort of "transient" condition (akin to the economic conditions in *Lockheed Martin*) that suggests a waterway is navigable; it is current physical reality inconsistent with concluding that the waterway is presently susceptible of supporting interstate commerce.

In sum, admiralty jurisdiction is lacking here because Crazy Pants has failed to satisfy the "location" requirement. The accident did not occur on navigable waters. The Court thus finds it unnecessary to reach the "connection" requirement.

### 3.  Jurisdictional Discovery

Crazy Pants requests additional jurisdictional discovery, arguing that further factual development is necessary to resolve purported disputes concerning the condition and operability of the Albeni Falls Dam log chute. The Court disagrees. In this case, no amount of discovery could transform the long-defunct, currently unusable log chute into one that is presently susceptible of being used as an artery of interstate commerce. The request will be denied.

### C. The Motion to Dismiss the Amended Third-Party Complaint

Given the lack of subject-matter jurisdiction over the limitation-of-liability

complaint, the next question is whether the Court must also dismiss Crazy Pants'

amended third-party complaint for lack of jurisdiction. Crazy Pants contends it

may proceed with this third-party complaint—even in the absence of admiralty

jurisdiction—because it asserted diversity of citizenship as an independent basis of

jurisdiction. Defendants MTI, Scism, Mercury Marine, and the Wozencraft

Defendants, on the other hand, say there is a domino effect—that once the Court

determines there is no admiralty jurisdiction over the Limitation Complaint, the

entire case collapses, and the Court has no choice but to dismiss the Amended

Third-Party Complaint. As these parties frame it, "Admiralty jurisdiction does not

exist in this case. It follows that the Court cannot exercise ancillary jurisdiction

over the Amended Third-Party Complaint." *MTI Reply,* Dkt. 138, at 9.[5] The Court

is not persuaded by this argument and will deny the motion to dismiss the amended

---

[5] The Faulhaber and Schulte claimants take no position regarding the motions to dismiss for lack of admiralty jurisdiction, although the Schulte claimants say that if the limitation complaint is dismissed, they are entitled to amend their complaint (*i.e.,* the complaint on file in *Schulte v. Kottmann,* No. 2:24-cv-307) "to include claims against Daiker et. al. which are stayed by the Stay Order associated with the Admiralty Complaint." Dkt. 124, at 2.The Court agrees that, with the limitation complaint dismissed and the stay order dissolved, the Schulte claimants logically should be able to pursue Crazy Pants and the Daiker Estate. But if they were to amend their complaint in this court, the parties would no longer be diverse. So the more obvious choice is to file in state court. Although the Court will not reach this issue, presumably, the applicable limitations period would be tolled, given that this Court's stay order prevented pursuing the Schultes from pursuing Crazy Pants and the Daiker Estate in state court. During oral argument, Crazy Pants' counsel stated that if there is no admiralty jurisdiction—and the Court has now concluded there is none—then he believed the statute of limitations would be tolled and that the Faulhabers and Schultes would have "absolutely every right to proceed" in state court.

third-party complaint, *provided, however,* that if Crazy Pants still wishes to pursue its claims against third-party defendants in federal court, it will be required to file an amended pleading, styled as a complaint.

In their moving papers, MTI and Scism principally relied on a Third Circuit case in support of their contention that the Court must dismiss the Amended Third-Party Complaint: *Nationwide Mutual Fire Insurance Co. v. T&D Cottage Auto Parts & Service, Inc.*, 705 F.2d 685 (3d Cir. 1983). *See Mtn. Mem.*, Dkt. 115-1 at 4. But *Nationwide*—which is non-binding in any event—doesn't countenance such a result. In *Nationwide,* an insurance company filed an interpleader action and one of the defendants asserted a counterclaim. When the interpleader claim became moot, the district court dismissed the counterclaim, concluding that it now lacked jurisdiction over the counterclaim. The Third Circuit disagreed, holding that "the mooting of Nationwide's complaint did not divest the court of jurisdiction over any counterclaims that arose out of the same transaction or occurrence as the complaint." *Id.* at 687. The case was remanded to the district court to determine whether the counterclaim arose out of the same transaction or occurrence as the insurer's complaint. In issuing this ruling, the court noted, in dicta, that "[w]e are aware that a complaint over which the court did not have jurisdiction at the time it was filed cannot support the exercise of ancillary jurisdiction." *Id.* at 688.

MTI and Scism direct the Court's attention to this dicta, but the Court does

not find it instructive here, because unlike in *Nationwide*—where the counterclaims depended on ancillary jurisdiction—Crazy Pants asserts an independent basis for subject-matter jurisdiction over the third-party claims: diversity of citizenship. It's also notable that the *Nationwide* Court invoked policy concerns such as "conservation of judicial resources and the avoidance of a multiplicity of litigation . . . ." *Id.* at 687. In other words, *Nationwide* took a pragmatic approach in deciding whether the counterclaim should proceed after the underlying action had been mooted. This Court will do the same.

On reply, MTI and Scism argued that Crazy Pants' position is at odds with Rules 14(a)(1) and 14(c) of the Federal Rules of Civil Procedure. Regarding Rule 14(c), MTI and Scism argue that Crazy Pants—as a limitation *plaintiff*—didn't properly utilize Rule 14(c) in the first place because that rule contemplates a *defendant* impleading third parties. *See Reply,* Dkt. 138, at 9 n.13. The Court is not persuaded by this argument because even though Crazy Pants was a limitation plaintiff, the third-party complaint was asserted in a defensive posture, after the Faulhaber and Schulte claimants filed proofs of claim. *See Petition of Klarman*, 270 F. Supp. 1001, 1003 (D. Conn. 1967) (concluding that a petitioner in a limitation proceeding may implead parties under Federal Rule of Civil Procedure 14(c)); *Texas Petroleum Inv. Co. v. Taylors Int'l Servs., Inc.,* No. 24-2344, 2025 WL 1282686, at *3 (E.D. La. May 1, 2025) (observing that even though Rule 14(c)

permits defendants to implead third-party defendants, allowing limitation plaintiffs to assert third party claims is a reasonable extension of Rule 14(c)).

Likewise, the Court is not persuaded by MTI and Scism's Rule 14(a)(1)-based  argument. On this point, MTI and Scism correctly point out that third-party complaints filed under Rule 14(a)(1) are appropriate only where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the "main claim." *Reply,* Dkt. 138, at 9-10 (citing *Stewart v. Am. Int'l Oil & Gas Co.,* 845 F.2d 196, 199-200 (9th Cir. 1988)).

But Rule 14 is a procedural mechanism. It does not confer or withdraw subject-matter jurisdiction, and the third-party plaintiffs have alleged complete diversity of citizenship. Plus, Crazy Pants alleged both derivative and direct liability within its third-party complaint. To provide one example, in the first claim for relief, Crazy Pants alleged that the "unreasonably dangerous or defective condition of the Boat proximately caused the Third-Party Plaintiffs harm, *including but not limited to the death of Gregory Daiker, and the potential liability of the Estate and Crazy Pants LLC to others arising out of the June 28, 2022 accident*." *Am. Third-Party Comp.* ¶ 4.6, Dkt. 54 (emphasis added). Perhaps this suggests that the third-party complaint was attempting to do too much—in that it gestured at both derivative and direct claims. But at this point—with the limitation complaint gone—the practical question is whether Crazy Pants may properly pursue the third-

party defendants. The Court finds that it can. There is no jurisdictional or

procedural impediment to it doing so. None of the cases cited by the moving

defendants holds that a court must dismiss third-party claims that independently

satisfy the requirement of 28 U.S.C. § 1332 simply because they were initially

asserted through impleader and the underlying action has been dismissed.

The Court will therefore deny the motion to dismiss the third-party

complaint for lack of jurisdiction. The Court does recognize, however, that without

an underlying "main action," this action logically should be restructured, as an

ordinary (*i.e.*, non-admiralty) civil case based on diversity of citizenship.

Accordingly, if Crazy Pants still wishes to pursue the third-party defendants in

federal court, despite the dismissal of the limitation complaint, it must file an

amended complaint based on diversity jurisdiction.

## D. Meet and Confer Obligation

Finally, the Court will turn to case management. Dismissal of the limitation

complaint carries significant practical consequences regarding how and where the

parties' claims ought to move forward. As an initial matter, dismissal of the

limitation complaint means the stay order—entered by this Court in January

2023—will dissolve. Thus, the *Faulhaber* state-court action may proceed. And the

Schultes have indicated they intend to pursue Crazy Pants and the Daiker Estate

once the limitation action is dismissed.

Under these circumstances—with related litigation in federal and state forums—there is a substantial risk of duplication and unnecessary expenditure of party and judicial resources. Accordingly, the Court will direct counsel for all parties to meet and confer in good faith regarding a reasonable path forward. The parties' discussion should address, at a minimum:  (1) which claims, if any, the parties intend to pursue following this order; (2) in what forum or forums those claims may properly be brought; and (3) what procedural steps are appropriate to avoid overlapping litigation.

The Court does not prescribe the outcome of that discussion, nor does it limit the topics discussed. Rather, the purpose of this directive is to ensure that the parties take a coordinated and deliberate approach to the remaining litigation, rather than proceeding piecemeal through overlapping actions. The Court expects counsel to engage constructively and to narrow issues where possible.

## ORDER

**IT IS ORDERED that:**

1.  Third-Party Defendant Performance LLC's Consolidated Motion to Dismiss (Dkt. 114) is **GRANTED.** Accordingly:

     a.  The Limitation-of-Liability Complaint (Dkt. 1) is **DISMISSED WITHOUT LEAVE TO AMEND.**

     b.  Third Party Defendant Performance LLC is **DISMISSED**

**WITHOUT PREJUDICE** as a defendant in the Amended Third-Party Complaint on file in this matter (Dkt. 54).

    c.  Defendant Performance LLC is **DISMISSED WITHOUT PREJUDICE** as a defendant in the complaints on file in *Faulhaber v. Kottmann,* No. 2:24-cv-305-BLW, and *Schulte v. Kottmann*, 2:24-cv-307-BLW.

2.    Third-Party Defendants Marine Technology Inc. and Randy Scism's Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Dkt. 115) is **GRANTED IN PART AND DENIED IN PART,** as follows:

    a.  The motion to dismiss the Limitation-of-Liability Complaint on file in this matter (Dkt. 1) is **GRANTED WITHOUT LEAVE TO AMEND.**

    b.  The motion to dismiss the Amended-Third-Party Complaint on file in this matter (Dkt. 54) is **DENIED.**

    c.  Crazy Pants and the Daiker Estate shall file an amended pleading within 45 days of this Order, assuming that they still wish to pursue the third-party defendants in federal court after dismissal of the limitation complaint.

3.    All remaining parties to this consolidated litigation are directed to meet and confer, consistent with the directive in Paragraph D of this

Order, within 21 days of this Order.

4.     The Court's January 26, 2023 Order—staying all claims and

proceedings against limitation plaintiffs Crazy Pants, LLC and the

Estate of Gregory John Daiker (Dkt. 7)—is **DISSOLVED.**

DATED: February 3, 2026

B. Lynn Winmill
U.S. District Court Judge